# United States District Court
# Northern District of Indiana

| | | |
|---|---|---|
| KENNEDY LENOIR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 3:07-CV-482 JVB |
| | ) | |
| D & M EXCAVATING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on Defendant's motion for summary judgment. Plaintiff alleges that Defendant D & M Excavating, Inc. discharged him from employment and subjected him to a hostile work environment because of his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981. He also alleges that the hostile work environment constitutes intentional infliction of emotional distress under Indiana tort law.

**(A) Facts**

The facts of this case viewed in a light most favorable to the Plaintiff are as follows: Defendant D & M Excavating's principal owners are Jay Miller, president, and Sandie Miller, chief financial officer. Their son, Ryan Miller, is vice-president and a job superintendent. Only Jay, Sandie, and Ryan have authority to hire, fire, or discipline employees. Plaintiff, an African-American, worked for Defendant on and off from October 1999 through August 31, 2006.[1]

---

[1] Plaintiff alleges in his complaint that he was discharged effective September 8, 2006, but does not challenge Defendant's assertion in its summary judgment materials that August 31, 2006, was his last day of work. Accordingly, the Court will adopt August 31, 2006, as the correct date. (R. Miller Aff., ¶ 11)

Plaintiff's dates of employment during this period were:

    October 19, 1999–December 21, 2001;

    March 7, 2002 –December 31, 2002;

    January 1, 2003–January 10, 2003;

    March 24, 2003–May 11, 2004;

    July 19, 2004–November 24, 2004;

    April 6, 2005–June 23, 2005; and

    July 5, 2006–August 31, 2006.

His employment terminated in May 2004 because of an injury. Plaintiff maintains that he was laid off all the other times.

On August 31, 2006, Plaintiff, who was the only African-American employed by Defendant, was working as a laborer on a pipe laying job. Another of Defendant's employees, Bendix, was the lead man on the job site. When Bendix told him to "run" to get some materials, Lenoir answered that he would get the materials, but would not run. Bendix then called Plaintiff a "worthless ass nigger." Plaintiff left the job site to go to Defendant's main office talk to Ryan Miller about the incident. At the office, Ryan Miller did not speak to him. Instead, Mike Albert, another employee, told him he was fired and handed him his final paychecks.

Before this final incident, Jay Miller and others referred to residents of poor neighborhoods near Defendant's job sites as "niggers." Jay Miller remarked to Plaintiff that he thought "all niggers from Africa love the heat." Ryan Miller frequently greeted Plaintiff with the words "what's up, my nigger." When Chris Yagelski, a co-worker, greeted Plaintiff the same

2

way, he reported it to Ryan Miller, who did nothing about it. Ryan Miller and other employees frequently told jokes using the term "nigger" in Plaintiff's presence. Plaintiff was also required to do work that white laborers on the job site were not required to do.

Defendant had a written policy prohibiting race discrimination and racial harassment in its employment manual. Under the policy, employees are directed to "immediately contact either Jay Miller, Ryan Miller, or Sandie Miller. If any complaint involves any employee's immediate supervisor, such employee(s) may present their complaint or charge to any other member of management staff." On June 20, 2004, Plaintiff received a copy of Defendant's employment manual containing its policies on equal opportunity employment. In addition, Defendant is a signatory to a collective bargaining agreement with Laborers Local Union No. 81, of which Plaintiff was a member. The CBA prohibits discrimination on the basis of race and provides a grievance procedure culminating in binding arbitration.

**(B) Summary Judgment Standard**

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of

the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party supports its motion for summary judgment with affidavits or other materials, it thereby shifts to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986).

Rule 56(e) specifies that once a properly supported motion for summary judgment is made, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby,* 477 U.S. 242, 249–50 (1986).

**(C) Events Before July 5, 2006**

Defendant argues that each use of the word "nigger" constitutes a separate discriminatory act for purposes of claims limitations. According to Defendant each use of that racial slur is a distinct claim. Therefore, under both the Title IV limitation period and the statute of limitations applicable to his §1981 claims, any use of that word before the beginning of his last stretch of

4

employment (which was more than 300 days before he filed his charge of discrimination and more than two years before his suit was filed) may not be considered as part of his claims. Plaintiff contends that all the incidents alleged by Plaintiff, whenever they occurred during his many periods of employment with the Defendant, are part of one hostile environment claim because at least one act contributing to the claim occurred within the limitation period.

The Supreme Court treats a hostile work environment as one unlawful employment practice. *See Nat'l. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–21, (2002). The employee may complain about any of the constituent acts, no matter how long ago they occurred, as long as a Title VII charge is filed within 300 days of any harassing act. *Isaacs v. Hill's Pet Nutrition, Inc*., 485 F.3d 383 (7th Cir. 2007). The Court rejects Defendant's contention that each use of the racial slur "nigger" constitutes a separate unlawful employment practice claim. Therefore, if Plaintiff had been continuously employed with Defendant from 2001 (he alleges the harassment began sometime after the first two years he worked for Defendant), the Court would agree that any incident that occurred during this entire period could be considered as part of a single hostile environment claim. However, the Court concludes that the discontinuity in employment divides the alleged harassing conduct into separate unlawful employment practices. Any such distinct hostile environment claims the Plaintiff may have for incidents which occurred before his last stretch of employment (July 5 through August 31, 2006) are outside the 300-day claim period of Title VII.

Nonetheless, the Plaintiff may still be able to rely on conduct which occurred before July 5, 2006, to support his § 1981 claims. This is so because the Court concludes that those claims

5

are governed by a four-year statute of limitations.[2] *Jones v. R.R. Donnelley & Sons* Co., 541 U.S. 369, 382–83 (2004); *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 269 (7th Cir. 2004). Conduct which occurred during earlier periods of employment may constitute separate hostile environment claims. Because neither party analyzed the evidence in light of the possible existence of several separate hostile environment claims over a four-year limitation period, the Court will not address the issue further at this time.

 **(D) Hostile Environment Claim**

Defendant argues for summary judgment on the hostile environment claim because it maintains there is no basis for employer liability. According to Defendant, because Plaintiff does not claim that he suffered any tangible employment action "on account of" the alleged harassment (Def. Br. at 14), Defendant is entitled to summary judgment because the facts establish the affirmative defense set out in *Burlington Industries v. Ellerth*, 524 U.S. 742 (1998) as a matter of law.[3] Under the principles of *Ellerth,* an employer is subject to vicarious liability for a hostile environment created by a supervisor with immediate or successively higher authority over the employee. When no tangible employment action is taken an employer can avoid such liability by way of an affirmative defense. To establish the affirmative defense, the employer must prove that it used reasonable care to prevent and promptly correct any harassing behavior and that the employee unreasonably failed to take advantage of the preventive or

---

[2]. Both parties assumed that the two-year statute of limitations recognized in *Movement for Opportunity & Equality v. General Motors Corp.*, 622 F.2d 1235 (7th Cir. 1980), applies to Plaintiff's § 1981 claims.

[3] Although *Ellerth* involved sexual harassment, courts have consistently applied the defense in the racial harassment context. *See Cerros v. Steel Technologies, Inc.,* 398 F.3d 944, 951–52 (7th Cir. 2005).

corrective opportunities. *Id.* at 765. However, if the employee can show that the supervisor's harassment culminated in a tangible employment action, the affirmative defense is unavailable. *Huff v. Sheahan*, 493 F.3d 893, 901 (7th Cir. 2007).

If the alleged harassment was perpetrated by co-workers rather than supervisors, the employer is liable if the employee can show that it was negligent in either discovering or remedying the harassment. *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000).

Plaintiff has offered evidence that harassment by supervisors (Jay and Ryan Miller) and co-workers culminated in a tangible adverse employment action, his discharge from employment with the Defendant. If a jury accepts his allegations that both Jay and Ryan Miller made offensive comments to him and that he was fired soon after he reacted to Bendix's racial slur by leaving the job site with the intention of talking to Ryan Miller, the affirmative defense afforded by *Ellerth* is not available to Defendant. Moreover, Defendant has not established the *Ellerth* defense as a matter of law. Whether Defendant used reasonable care to prevent and correct harassment and whether Plaintiff unreasonably failed to take advantage of preventive or corrective opportunities provided by Defendant are questions for the jury. Similarly, the Plaintiff has pointed to facts from which a jury could conclude that Defendant was negligent in discovering or remedying harassment by co-workers.

**(E) Discriminatory Discharge Claim**

The Court concludes that Plaintiff has pointed to enough evidence to present a jury question as to whether he was fired and whether race was a motivating factor in the decision to

fire him. Accordingly summary judgment is denied on that issue.

### (F) Intentional Infliction of Emotional Distress

Court concludes that jury questions are presented as to Defendant's liability for intentional infliction of emotional distress.

### (G) Conclusion

For the reasons set forth above Defendant's motion for summary judgment (DE 20) is denied.

SO ORDERED on February 17, 2009.

 s/ Joseph S. Van Bokkelen
Joseph S. Van Bokkelen
United States District Judge
Hammond Division